IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| FREMONT HOUSING GROUP, LLC, a Washington limited liability company, Respondent, v. MOD SUPER FAST PIZZA, LLC, a Delaware limited liability company, Appellant. | No. 87868-9-I DIVISION ONE UNPUBLISHED OPINION |

CHUNG, J. — Fremont Housing Group LLC ("Fremont") and MOD Super Fast Pizza LLC ("MOD") entered into a commercial lease in September 2018. In June 2024, Fremont brought an action against MOD for breach of the lease, in which MOD failed to appear. Fremont subsequently obtained a default judgment that included accelerated rent damages. Once MOD learned of the proceedings, it moved to vacate the judgment under CR 60(b). The trial court commissioner denied the motion. MOD filed a motion to revise the commissioner's ruling on the motion to vacate. The trial court denied the motion to revise and MOD now appeals. Because the trial court did not abuse its discretion, we affirm.

FACTS

Fremont and MOD entered into a commercial lease in September 2018. Under the lease, MOD was to rent premises at The Epicenter from Fremont for ten years, ending in June 2029. Section 15 of the lease describes multiple events

that would constitute default and breach, including rent default and abandonment. Under Section 15.1, failure to make a payment of rent for five days after written notice from Fremont constitutes rent default. Under Section 15.2 of the lease, absence from the premises for 30 days or longer while in default of any provision of the lease constitutes abandonment.

Section 16 of the lease identifies remedies for default, including termination of the lease. However, Section 16.2 specifies that "Landlord shall not be entitled to accelerate Rent payable under the Lease unless Tenant is in default," including under Section 15.1, "provided, however, for purposes of this Section 16.2, a default under Section 15.1 shall not include a default based on Tenant's failure to pay an amount about which there exists a good faith dispute." Further, Section 16.2 continues, upon such termination, Fremont may recover unpaid rent at the time of termination and, as relevant here, future rent. The lease defines future rent as "[t]he worth at the time of award of the amount by which the reasonable value of the unpaid Rent for the balance of the Term of this Lease exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided."

MOD stopped paying rent in April 2024. On April 11, 2024, MOD sent Fremont a letter informing Fremont that it was abandoning the premises and the lease. Fremont subsequently sent MOD notices of default on April 16, 2024, and May 10, 2024.

Fremont then initiated this action against MOD on June 18, 2024. The deadline to answer the complaint was July 10, 2024. MOD failed to appear or

2

respond to the complaint. Subsequently, on July 18, 2024, Fremont moved for a default judgment, asserting as damages "base rent for the months of May 2024 through June 2029 . . . totaling no less than $770,804.00." A King County Superior Court commissioner granted the motion and entered the default judgment on July 19, 2024.

MOD asserts that it first learned of this action on October 3, 2024, from MOD's national litigation counsel, which discovered the default judgment during a litigation search. Thereafter, on October 22, 2024, MOD moved to vacate the default judgment, asserting (1) that its failure to appear was due to excusable neglect and (2) MOD had a prima facie defense to Fremont's damages claim because the lease did not allow for the award of unmitigated accelerated rent under these circumstances.

According to MOD, its registered agent did not receive service of process and did not transmit notice of the lawsuit to MOD. The parties do not dispute that MOD's registered agent is Corporation Services Company ("CSC"). CSC has a business agreement with Accufacts, a company that allows CSC to use its business address and "handles the initial receipt, logging, and uploading of all documents directed to CSC's registered agent customers in Washington." Fremont's declaration of service, signed by a process server at Halo Messenger Services, LLC, attests that the complaint was personally served on Ellen Jones, "Customer Service Associate at [CSC]," on Thursday, June 20, 2024, at 3:15 p.m. MOD, however, submitted a declaration by Ellen Jones, identifying herself as "an Executive Assistant for Accufacts" and stating she had "no recollection of

receiving any documents in [this] . . . matter on June 20, 2024, or at any other time." MOD also presented evidence that when MOD asked CSC to look into the certificate of service for the complaint, CSC responded that it "ran a search" on all documents served that day in Washington and "did not locate any documents related to this case."

The same commissioner who granted the default heard MOD's motion to vacate on December 10, 2024. The commissioner found it likely that Jones had been served, noting that there was a dispute regarding service of the summons and complaint:

> We have a process server -- professional process server, it appears, who indicates that in a declaration signed, I believe the day after service was -- he indicates service was attained, that on day and time at location, a specific individual was served with the summons and complaint. . . . [T]his was in June. In October of the same year, we have a declaration from the individual, who was allegedly served, indicating that she doesn't have any recollection of being served with anything from plaintiff here, Fremont Housing Group, or at anytime. And she has no record of having entered that service in any records that they have, and apparently the records don't demonstrate that.
> . . .
> But under these circumstances, I do not find that Ms. Jones'[s] declaration really goes to answering the declaration of service, which is standard form declaration of service, very clear, date, time, location, and individual. So I'm persuaded that that's the case.

Likewise, the commissioner found that MOD's failure to appear was not excusable error based on case law "that basically says if there's a breakdown in the way something is done if things are—if there is a problem like that, that does not amount to excusable neglect."

Finally, the commissioner found the lease contained a valid acceleration clause, reasoning, "I don't see how going to trial is going to somehow allow

4

another judicial officer to come up with a – some sort of figure or algorithm or something like that, that's got to allow for a different judgment amount." Accordingly, the commissioner denied MOD's motion to vacate the default judgment.

MOD then sought revision. After a hearing, the court made a credibility determination that MOD had been served and found that the damages awarded were "supported by the lease provisions which does have an acceleration clause." Accordingly, the court affirmed the commissioner's ruling. MOD timely appeals.

## DISCUSSION

"Where the superior court has made a decision on a motion for revision, the appeal is from the superior court's decision, not from the commissioner's decision." Boeing Emps. Credit Union v. Burns, 167 Wn. App. 265, 270, 272 P.3d 908 (2012). "But when the superior court denies a motion for revision, it adopts the commissioner's findings, conclusions, and rulings as its own." State ex rel. J.V.G. v. Van Guilder, 137 Wn. App. 417, 423, 154 P.3d 243 (2007) (citing RCW 2.24.050).

We review a court's decision regarding a motion to vacate a default judgment for abuse of discretion. TMT Bear Creek Shopping Ctr., Inc. v. Petco Animal Supplies, Inc., 140 Wn. App. 191, 199, 165 P.3d 1271 (2007). "A trial court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds, or for untenable reasons." Id.

CR 60(b)(1) allows a court "[o]n motion and upon such terms as are just" to grant a moving party relief from an order due to a party's "[m]istakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order." A motion to vacate "shall" be "supported by the affidavit of the applicant . . . setting forth a concise statement of the facts . . . upon which the motion is based, and if the moving party be a defendant, the facts constituting a defense to the action or proceeding." CR 60(e)(1).

Default judgments are "not favor[ed]" because we "prefer to give parties their day in court and have controversies determined on their merits." Morin v. Burris, 160 Wn.2d 745, 754, 161 P.3d 956 (2007). "Balanced against that principle is the necessity of having a responsive and responsible system which mandates compliance with judicial summons." Griggs v. Averbeck Realty, Inc., 92 Wn.2d 576, 581, 599 P.2d 1289 (1979). Proceedings to vacate a default judgment are equitable in character, and relief should be "afforded in accordance with equitable principles." Id. "The trial court should exercise its authority 'liberally, as well as equitably, to the end that substantial rights be preserved and justice between the parties be fairly and judiciously done.' " Id. at 582 (quoting White v. Holm, 73 Wn.2d 348, 351, 438 P.2d 581 (1968)).

Courts take into consideration four factors in determining whether to vacate a default judgment:

> (1) That there is substantial evidence extant to support, at least prima facie, a defense to the claim asserted by the opposing party;
> (2) that the moving party's failure to timely appear in the action, and answer the opponent's claim, was occasioned by mistake, inadvertence, surprise or excusable neglect;

6

(3) that the moving party acted with due diligence after notice of entry of the default judgment; and

(4) that no substantial hardship will result to the opposing party.

White, 73 Wn.2d at 352. The first two factors are primary, while the third and fourth are secondary. Ha v. Signal Elec., Inc., 182 Wn. App. 436, 449, 332 P.3d 991 (2014) (citing Little v. King, 160 Wn.2d 696, 703-04, 161 P.3d 345 (2007)). "The test is not mechanical," and "[w]hether or not a default judgment should be set aside is a matter of equity." Id. (citing Little, 160 Wn.2d at 704).

The White factors "vary in dispositive significance as the circumstances of the particular case dictate." White, 73 Wn.2d at 352. "[W]here the moving party is able to demonstrate a strong or virtually conclusive defense to the opponent's claim, scant time will be spent inquiring into the reasons which occasioned entry of the default." Id. Where a party can demonstrate at least a prima facie defense, however, "the reasons for [its] failure to timely appear in the action before the default will be scrutinized with greater care." Id. at 352-53. When the moving party does not satisfy the second White prong, its argument can be "doom[ed] . . . despite the presence of a prima facie defense." DeCaro v. Spokane County, 198 Wn. App. 638, 644, 394 P.3d 1042 (2017). See also, e.g., Johnson v. Cash Store, 116 Wn. App. 833, 846, 68 P.3d 1099 (2003) (affirming denial of motion to vacate a default judgment where the court found inexcusable neglect and only a plausible prima facie defense as opposed to a "strong or virtually conclusive" defense).

Here, as to the first White factor, MOD argues that there was substantial evidence to support a prima facie defense. Section 16.2 of the lease allowed

Fremont to accelerate rent if MOD was in default, unless the default was based on failure to pay an amount "about which there exists a good faith dispute." MOD did not argue that it had a good faith dispute about the amount of rent. Instead, MOD argued to the trial court that (1) it was not in default and had not abandoned the premises, so Section 16.2 allowing the remedy of acceleration of rent damages did not apply;[1] and (2) even if Section 16.2 allowed accelerated recovery, it had to take into account Fremont's efforts to mitigate its damages.

On appeal, MOD advances only the second argument, contending that the damages awarded to Fremont were "far in excess of the amount that is permitted under the Lease."[2] Because "[d]amages are an essential element of a breach of contract claim," MOD argues it "has a cognizable and meritorious defense to Fremont's damages claim, and it should be allowed to present that defense" in the trial court. Specifically, according to MOD, the lease requires accelerated damages to be offset by mitigation, so it should have been given the opportunity "to prove what rental loss could have been avoided."

Section 16.2 of the lease allows Fremont to recover both unpaid rent and future rent and defines future rent as "[t]he worth at the time of award of the amount by which the reasonable value of the unpaid Rent for the balance of the

---

[1] Specifically, MOD claimed Fremont did not allege that it ever gave MOD written notice of the failure to pay rent, so it was not in default under Section 15.1. MOD further argued that as a result, it had not abandoned the premises while in default, as Section 15.2 of the lease required for abandonment. MOD then argued that because it had not violated Section 15.1, acceleration was not available as a remedy under Section 16.2 of the lease. In response to the motion to vacate, Fremont presented evidence that it had provided notice. MOD did not provide evidence rebutting Fremont's evidence, did not revisit these arguments in its reply on its motion to vacate or in its motion for revision, and does not raise them on appeal.

[2] On appeal, MOD posits—for the first time—that even if the clause allowed for the award of unmitigated acceleration of rent damages, the provision would be legally unenforceable and punitive. As this argument was not presented to the trial court, and we review the trial court's decision for abuse of discretion, we do not consider this newly raised defense.

Term of this Lease exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided." The trial court noted while there was a duty to mitigate built into the lease, in light of MOD's default and the acceleration provision, it did not "see how going to trial [wa]s going to somehow allow another judicial officer to come up with a—some sort of figure or algorithm or something like that, that's got to allow for a different judgment amount." MOD challenges this reasoning, arguing that a trial court could have found a different damages amount if MOD were allowed to present mitigation evidence, "perhaps demonstrating that Fremont undertook no efforts to mitigate or that whatever efforts Fremont undertook were unreasonable, thereby giving rise to a viable defense and calling into question the judgment for seven years of accelerated rent."

However, under the lease, MOD had the burden of proving the amount of rental loss that Fremont could have been reasonably avoided.[3] "It is not a prima facie defense to damages that a defendant is surprised by the amount or that the damages *might* have been less in a contested hearing." Little, 160 Wn.2d at 704 (Emphasis added). "Except in unusual circumstances, a party who moves to set aside a judgment based upon damages must present *evidence* of a prima facie defense to those damages." Id. (Emphasis added). For example, in Little, a plaintiff injured in a vehicle collision obtained a default judgment, and the defendants argued that they had a prima facie defense that "the damages

---

[3] In relevant part, Section 16.2(b) of the lease states that "[t]he worth at the time of award of the amount by which the reasonable value of the unpaid Rent for the balance of the Term of this Lease exceeds the amount of such rental loss that *Tenant* proves could have been reasonably avoided." (Emphasis added).

awarded were unreasonable" because "preexisting conditions may have contributed to Little's injury." Id. The court held that the defendants had "provided *no* competent evidence of a prima facie defense to damages" and "mere speculation is not substantial evidence of a defense."[4] Id. at 704-05.

Here, MOD did not present any evidence of the amount of mitigation to the trial court. Thus, like the defendants in Little, MOD failed to provide competent evidence of a prima facie defense to damages.[5] As MOD itself acknowledged, at most, it presented only a possible prima facie defense, not a "strong or virtually conclusive" one. See White, 73 Wn.2d at 352. Accordingly, the trial court could "scrutinize[] with greater care" the second White factor, the reasons for its failure to timely appear. Id. at 352-53.

Before the trial court, the parties disputed whether MOD was served. The trial court made a finding that MOD had been served. On appeal, however, MOD posits that "[t]his appeal does not center on efficacy of service to Accufacts." Instead, MOD argues that even if Accufacts/CSC was properly served, MOD's

---

[4] And, in fact, MOD argues—for the first time on appeal—that providing such evidence is impossible until "those seven years have . . . elapsed."

[5] The court in Little reasoned,

> The only thing offered was a declaration from an insurance adjuster stating that the adjuster had reviewed Little's medical records and found reports of headaches, hip pain, and depression before the collisions. But the moving parties have simply not presented any evidence that would tend to show that Little's preaccident aches, pains, and depression were related in any way to her postaccident condition. Even viewed in the light most favorable to the parties moving to set aside the default judgment, mere speculation is not substantial evidence of a defense.

160 Wn.2d at 704-05.

failure to appear was excusable neglect because it did not receive the complaint due to the failure of its third-party registered agent.

To support its excusable neglect argument, MOD relies on DeCaro, 198 Wn. App. 638. In DeCaro, defendant Spokane County was served but failed to forward the notice to defense counsel, and, thus, the defendant did not appear. Id. at 640. The court entered a default judgment against the defendant. Id. Shortly after, the defendant later moved to set aside the default judgment. Id. The trial court vacated the default judgment because "the County made a mistake about answering the suit, had a potential defense at trial, and rapidly acted to set aside the default." Id. at 645-46. This court affirmed because "[t]he trial court had a tenable reason for granting the motion." Id. at 646. But a decision concluding "that the trial court did not abuse its discretion [by granting a motion to vacate] does not necessarily indicate that the trial court would have abused its discretion by denying a motion to vacate under similar circumstances." TMT, 140 Wn. App. at 213 n.11. Accordingly, DeCaro is not dispositive.[6]

Instead, "what is just and proper must be determined by the facts of each case, not by a hard and fast rule applicable to all situations regardless of the outcome." TMT, 140 Wn. App. at 200. In TMT, defendant PETCO failed to

---

[6] MOD also relies on Dougherty v. Janes Gypsum Floors, Inc., No. 85442-9-I, (Wash. Ct. App. Aug. 5, 2024) (unpublished) https://www.courts.wa.gov/opinions/pdf/854429.pdf. As Dougherty is unpublished, it has no precedential value. GR 14.1(a). Also, it is factually distinguishable: though Dougherty also involved service on a registered agent, the court specifically noted, "This is not the situation where a registered agent is properly served and simply fails to forward it to the company it is paid to represent." Id., slip op. at 12. In other words, Dougherty did not involve the situation in this case, where CSC was properly served and failed to forward it to MOD. Finally, although the Dougherty court held the trial court did not abuse its discretion in vacating default orders, in doing so, it specifically cited TMT's observation that "the court's decision [in another case] finding that the trial court did not abuse its discretion does not necessarily indicate that the trial court would have abused its discretion by denying a motion to vacate under similar circumstances." Id., slip op. at 12 (quoting TMT, 140 Wn. App. at 213 n.11).

respond to a summons and complaint because its legal assistant failed to ensure its general counsel received notice of the dispute before leaving on an extended vacation. Id. at 197-98. We held the trial court did not abuse its discretion in denying the motion to vacate because "PETCO's neglect was due to a breakdown in internal office management and procedure and was, therefore, inexcusable." Id. at 213.

Here, the trial court determined that MOD's registered agent was properly served and MOD did not demonstrate excusable neglect because its failure to appear was due to "a breakdown in the way something is done." MOD challenges this conclusion, positing that there is a "crucial . . . layer between receipt of service and MOD's awareness of these proceedings that demonstrates excusable neglect" because of the "multiple steps at the registered agent level [between Accufacts and CSC] that the Summons and Complaint needed to go through to reach MOD."

Fremont responds that DeCaro and Dougherty do not support MOD's argument on excusable neglect, as the courts there found defendants had meritorious defenses before they addressed excusable neglect. Further, Fremont disputes MOD's argument that only *internal* mismanagement, as in TMT, can show inexcusable neglect, so "a finding of excusable neglect . . . turns on whether service was made on an internal employee vers[u]s a third-party agent." In support, Fremont contends, "Washington courts have explicitly held that a registered agent's failure to forward a complaint to its client did not constitute

excusable neglect," citing Brooks v. Univ. City, Inc., 154 Wn. App. 474, 225 P.3d 489 (2010).

But Fremont overstates the precedential value of Brooks; the court did not "explicitly" state that a registered agent's failure to forward a complaint is inexcusable. In Brooks, the plaintiff brought a personal injury action against defendant ICT and a co-defendant. Id. at 476. ICT's third-party registered agent mistakenly forwarded the summons and default order to the wrong ICT employee. Id. at 477. The plaintiff obtained an order of default, a copy of which she mailed to ICT, and, later, a default judgment against ICT, which the plaintiff also mailed to ICT. Id. at 476-77. But ICT did not appear or move to vacate the default order and judgment[7] until two years after proper service, when the plaintiff had already settled and dismissed her claims against the co-defendant. Id. at 477. The trial court held that ICT did not establish excusable neglect based on the third-party agent's mistake and denied the motion to vacate based on the defendant's two-year delay in appearing and equitable concerns. See id. at 479.[8] This court affirmed, reasoning that the trial court had tenable reasons to conclude that ICT failed to show excusable neglect because it "first appeared in this action

---

[7] In Brooks, defendant ICT moved to vacate under CR 55(c)(1), not CR 60(b). The standard for setting aside a default order under CR 55(c)(1) is "a showing of good cause, i.e., a showing of excusable neglect and due diligence," and the movant need not show a defense on the merits. Brooks, 154 Wn. App. at 479 (citing CR 55(c)(1)).

[8] The trial court reasoned,

> The fact that you're a registered agent, got it, sat on it, didn't do anything or sent it to the wrong person is sad. . . . [N]ow we jump ahead all the way to [two years later] [ICT's first appearance]. I just think it's way beyond the time and equitable [not to vacate the order] . . . . [T]o go back and undo it now where [plaintiff and the other defendant have] already settled and have no recourse against the other co-defendant for the rest of the damages would be inequitable . . . to the plaintiff.

Brooks, 154 Wn. App. at 477 (some alterations in original).

more than two years after being properly served with a summons because its own registered agent failed to forward the summons to its legal department." Id. at 479-80.

MOD tries to distinguish Brooks because there, the defendant at least received the complaint, even if it did not reach the appropriate internal party, whereas here, the defendant did not receive the summons and complaint *at all* due to a third-party failure. But in Brooks, the court's conclusion of inexcusable neglect was not solely based on the registered agent's failure to forward the complaint, but on other factors, particularly the long-elapsed time before ICT's appearance and motion to vacate.

Thus, here, the two primary White factors provide a tenable basis for the trial court's decision not to vacate the default judgment based on excusable neglect. The third and fourth White factors, which are secondary to the first two factors, do not suggest a different conclusion is warranted.

As to the third factor, whether "the moving party acted with due diligence after notice of entry of the default judgment," White, 73 Wn.2d at 352, "[a] motion to vacate under CR 60(b)(1) must be filed within a reasonable time and within one year from the judgment." Ha, 182 Wn. App. at 454.[9] Here, MOD filed its motion to vacate less than a month after it learned of the default judgment, just over four months after the action was initiated, and just after three months from

---

[9] "The critical period is between when the moving party became aware of the judgment and when it filed the motion to vacate," and "[w]hat constitutes a 'reasonable time' depends on the facts and circumstances of each case." Ha, 182 Wn. App. at 454. See, e.g., id. (defendant acted diligently when it entered a special notice of appearance "just over one month after it received notice of the default judgment"); Johnson, 116 Wn. App. at 842 (filing motion to vacate less than a month after notice was diligent); cf. Gutz v. Johnson, 128 Wn. App. 901, 919, 117 P.3d 390 (2005), aff'd sub nom. Morin v. Burris, 160 Wn.2d 745, 161 P.3d 956 (2007) (response to default judgment three months after notice of entry was not within a reasonable time).

entry of the default judgment. Fremont did not challenge whether MOD acted with due diligence.

As to the fourth White factor, whether the opposing party will suffer substantial hardship from vacation of the default judgment, Fremont argued to the trial court that it would be substantially harmed if the court vacated the default judgment because MOD was nearing bankruptcy and it would be likely Fremont would never be able to recover any damages or be made whole. MOD responded that the bankruptcy claims were unsubstantiated.

In response, MOD argues that not only would Fremont not be harmed, but instead, it would obtain a windfall if it were able to obtain a judgment of seven years of rent while being able to re-let the property. According to MOD, its defense regarding the acceleration clause "sp[oke] to the inequity in not overturning the default judgment here." But the alleged inequity of the application of a valid lease provision is not the equity that is the concern on a CR 60(b)(1) motion. Rather, the requirement of a prima facie defense to the claim has the purpose of "avoid[ing] a useless subsequent trial if the defaulted defendant cannot bring forth facts to make such a showing when seeking to vacate the default." Griggs, 92 Wn.2d at 583.

The trial court should exercise its authority "liberally, as well as equitably, to the end that substantial rights be preserved and justice between the parties be fairly and judiciously done." White, 73 Wn.2d at 351. "The fundamental guiding principle" is " 'whether or not justice is being done. . . . What is just and proper must be determined by the facts of each case, not by a hard and fast rule

applicable to all situations regardless of the outcome.' " Griggs, 92 Wn.2d at 582 (quoting Widucus v. Southwestern Elec. Cooperative, Inc., 26 Ill.App.2d 102, 109, 167 N.E.2d 799 (1960)). Here, MOD did not present a "strong or virtually conclusive" defense. See White, 73 Wn.2d at 352. At most, MOD presented a possible prima facie defense, but did not present any actual evidence of its prima facie defense, relying only on speculation that it "perhaps" could "demonstrate[e] that Fremont undertook no efforts to mitigate or that whatever efforts Fremont undertook were unreasonable." Indeed, MOD claims "**it is not possible**" to provide proof of its prima facie defense until after the remaining seven years of the lease have elapsed.

A trial court does not abuse its discretion in denying a motion to vacate where the movant presents only a prima facie defense and it determines there is no excusable reason for failing to appear. See, e.g., Johnson, 116 Wn. App. at 842, 848-49. "The motion to vacate is addressed to the sound discretion of the trial court and this court, on appellate review, will not disturb the trial court's disposition unless it clearly appears that that discretion has been abused." Griggs, 92 Wn.2d at 582. "[I]f a trial court's ruling 'is based upon tenable grounds and is within the bounds of reasonableness, it must be upheld.' " Showalter v. Wild Oats, 124 Wn. App. 506, 510, 101 P.3d 867 (2004) (internal quotation marks omitted) (quoting In Re Estate of Stevens, 94 Wn. App. 20, 30, 971 P.2d 58 (1999)). We conclude the trial court's ruling denying MOD's motion to vacate was based on tenable grounds, so it did not abuse its discretion.

CONCLUSION

We affirm.

_____Chung, J._____

WE CONCUR:

_____Díaz, J._____                    _____